## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| STANLEY W. PAGOREK, individually and on behalf of all others similarly situated;<br><br>      Plaintiffs,<br><br>      v.<br><br>VIZIO, INC., a California corporation, and COGNITIVE MEDIA NETWORKS, INC., a Delaware corporation,<br><br>      Defendants. | |

## FIRST CORRECTED COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff Stanley W. Pagorek (hereinafter "Plaintiff") brings this class action complaint (hereinafter "Complaint") against Defendants Vizio, Inc., (hereinafter "Vizio") and Cognitive Media Networks, Inc. (hereinafter "Cognitive") (hereinafter referred to together as "Defendants") based on their surreptitious inclusion of tracking software on their high-definition internet connected televisions (hereinafter "Smart TVs"). Plaintiff, on behalf of himself an all others similarly situated, seeks injunctive and monetary relief.

## PARTIES

1.     Plaintiff Stanley W. Pagorek is a natural person and citizen of the State of Indiana.

2.      Defendant Vizio, Inc., is a California corporation with its principal place of business located at 39 Tesla, Irvine, California 92618.  Vizio does business throughout the United States and the State of Indiana, including in this judicial District.

3.      Defendant Cognitive Media Networks, Inc., is a Delaware corporation with its principal place of business located at 1663 Mission Street, San Francisco, California 94103.  Cognitive does business throughout the United States and the State of Indiana, including in this District.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as this action arises, in part, under the Video Privacy Protection Act, which is a federal statute codified at 18 U.S.C. § 2710.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a different state than the Defendants; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and none of the exceptions under that subsection apply to this action.

5.      This Court retains personal jurisdiction over the Defendants because both Defendants conduct business in Indiana and events giving rise to this lawsuit occurred in Indiana.

6.      Venue is proper in the United States District Court for the Northern District of Indiana pursuant to 28 U.S.C. § 1391(b) because Defendants conduct significant business in this judicial District and the Plaintiff is a resident of this judicial District.

## FACTUAL BACKGROUND

2

7.      Defendant Vizio bills itself as a leading high definition television producer in the United States.  In addition to televisions, Vizio manufactures and sells various audio and entertainment products, including sound bars, tablets, DVD players and Blu-ray players.  Vizio generated approximately $3 billion in revenue in 2014.[1]  Vizio has a controlling stake in Cognitive, and uses Cognitive's content-recognition software.

8.      Defendant Cognitive is an advertising company that provides "Automatic Content Recognition" software (hereinafter "ACR software" and "tracking software") for Smart TVs.  This software enables Defendants to monitor and identify class members' video viewing habits.  Defendant Cognitive provides this secretly collected information to third-party advertisers and content providers who, in turn, display targeted advertisements, based on this collected information, to consumers.

9.      Vizio Smart TVs provide consumers with multiple access points to visual, audio and other video content.  As with many Smart TVs, Vizio Smart TVs are equipped with HDMI connections, coaxial connectors, analog audio outputs and inputs, and various video input connectors.

10.     Vizio Smart TVs are also equipped with the ability to connect to the internet via wireless internet networking (hereinafter "WiFi").  Specifically, Vizio Smart TVs allow consumers to access the WiFi networks via the Vizio Internet App and the Vizio Internet App Plus software services.  These applications allow consumers to access and watch

---

[1] *See* http://www.forbes.com/companies/vizio/ (last visited December 9, 2015).

3

various forms of audio and visual entertainment online, as well as to find access to online news, weather, and entertainment sources.

11.     Vizio Smart TVs are delivered to consumers with many pre-installed applications.   These include such popular internet applications as Netflix, YouTube, Amazon, Pandora, HuluPlus, Twitter, and more.  Many of these applications stream video to consumers via Vizio Smart TVs.  In fact, the Vizio Smart TV remote control contains shortcuts providing direct access to some of the more popular video streaming services, such as Netflix, with the push of one, direct access button.

12.     Additionally, Vizio Smart TVs provide access to cable television, satellite television, and on-demand viewing services.  Such services also stream video and audio programming directly to Vizio Smart TVs.

13.     Recent investigations have determined that Vizio uses ACR software to secretly monitor and track, in real time, the viewing habits of its customers. This tracking software, referred to by Vizio as "Smart Interactivity," is activated by default for the more than 10 million Vizio Smart TVs the company has sold in recent years.

14.     According to the detailed investigations, the Vizio tracking software works by analyzing bits of the video and other visual programming its customers are watching, in real time.  The technology then allows Vizio to determine the date, time, channel of

4

programs, and whether customers watched this programming in real time or from a recording.[2]

15.     The tracking technology also allows Vizio to determine whether a viewer is watching a traditional television or cable program or whether the customer is viewing programming via streaming Internet applications such as Netflix, Amazon Prime, or Hulu. The technology determines the time frame during which the programming was viewed, as well as the duration for which the customer actually viewed it.

16.     Vizio, armed with this surreptitiously collected information on the customers' viewing habits, then connects the information to the customers' personal internet protocol (hereinafter "IP") address.  This is the internet address that is used to identify every internet connected device in a home, office, or other connected environment. These devices include smartphones, tablet computers, laptop computers, desktop computers, and any other wireless device that shares the same IP address as the Smart TV.

17.     IP addresses are closely connected to the individuals using the specific IP address.  For instance, hundreds of personal attributes can be connected to a specific IP address, including a customers' age, profession, and certain wealth indicators.

18.     The Vizio tracking software is also designed to scan a consumer's home WiFi networks to secretly collect information that is then utilized to help determine the specific person whose viewing activity has been collected.

_____

[2] *See Own a Vizio Smart TV?  It's Watching You*, PROPUBLICA.ORG (Nov. 9, 2015)
http://www.propublica.org/article/own-a-vizio-smart-tv-its-watching-you (last visited Nov. 24, 2015).

19.     To accomplish this, Vizio provides the collected information to data brokers, which are entities that offer data enhancement services.[3]   These brokers are able to match the information to information in its database.   Linking the two data-sets allows the data broker to inform Vizio, and thus, indirectly, Vizio's third party customers, of the identity of the individual watching the specific programming on the Vizio Smart TV.   That is, this software actually allows Vizio to determine, within a certain degree of accuracy, which person in a home is watching what and when.

20.     Armed with this secretly collected viewing information, Vizio then sells the information to third parties, including advertisers.   This information allows advertisers and marketers to determine which advertisements to display on not only a consumer's Vizio Smart TV, but also any other "smart" devices connected to the same IP address, such as smartphones, tablets and computers.   Thus, watching a specific program on the Vizio Smart TV allows advertisers to determine which advertisements to publish on your smartphone.

21.     In other words, Vizio is secretly spying on its customers for profit. Vizio does not deny that it is violating its customers' privacy in this manner.   According to an October 2015 Securities and Exchange Commission filing for an initial public offering, Vizio described its ability to provide "highly specific viewing behavior data on a massive scale with great accuracy."[4]   Then, in a Washington Post interview, a Vizio spokesperson explained that the company's data mining programs are part of a "revolutionary shift across

---

[3] *Id.*
[4] Vizio, Inc., Prospectus (Form S-1) at 19 (October 22, 2015) ("Prospectus").  Relevant portions attached as Exhibit A.

all screens that brings measurability, relevancy and personalization to the consumer like never before."

22.     In fact, the October 2015 SEC filing reveals Vizio's intent to profit off of its secrete data collection effort:

> The success of our Inscape data services will depend on many factors, including our ability to provide viewing behavior data that advertisers and media content providers find useful and valuable. This ability, in turn, depends to a significant extent on the willingness of consumers to continue to purchase and use our Smart TVs and in our maintaining and continuing to grow our community of VIZIO connected units, or VCUs.   A VCU represents one of our Smart TVs that has been connected to the Internet and has transmitted data collected by our Inscape data services. While we believe our current community of over 8 million VCUs enables the data we provide to reflect U.S. census demographics, a larger and broader user base may be necessary for us to sufficiently monetize some services we may offer in the future, such as delivering targeted audiences to advertisers.

> Through our Inscape data services, we are capable of collecting meaningful viewing behavior data by matching attributes of content displayed on the screens of our ACR-capable, connected Smart TVs to a database of existing content, such as movies, TV shows and games. We currently rely on our third-party licensor of ACR technology to continue to develop and update this database, and to match the content in this database to content displayed on our VCUs.[5]

23.     Ironically, despite its public assurances that there was nothing untoward about its surreptitious data collection, Vizio acknowledged in this same filing that consumers may be uncomfortable with the technology, which might negatively impact its growth strategy:[6]

> Furthermore, some individuals may be reluctant or unwilling to connect to the Internet through our Smart TVs because they have concerns regarding the risks associated with data privacy and security. If the wider public

---

[5] *Id.* at 26-27.
[6] *Id.*

perceives data privacy or security concerns with respect to our Smart TVs, this could negatively impact the growth potential for the net sales of our Smart TVs and our Inscape data services.

24.     Although Vizio claims that its customers may choose whether or not to have their data collected, this is, in practicality, a false promise.  Defendant Vizio does not obtain its consumers' consent to the monitoring during the initial Smart TV setup stage, nor does Vizio proactively notify its consumers that the company will be collecting the consumers' viewing data by utilizing the pre-installed tracking software. Rather, Vizio omits this material information in its communications with its consumers.

25.     In reality, Vizio conceals the tracking software and the method for disabling it.  To "opt-out" of the monitoring, the consumer must somehow find the privacy policy, read and comprehend the complex legal text, and understand how and why Vizio is monitoring and collecting their personal information, including viewing habits. Vizio places its privacy policy on the television screen itself, but behind a series of electronic menus. Once accessed, the privacy policy appears on a very small area of the television screen, requiring the user to be very close to the television, while electronically scrolling through prolix text to find any alleged disclosure. Thus, for the vast majority of consumers who are unaware of the need to take steps to ensure their privacy, Vizio does nothing to alert them, preferring to keep its invasive monitoring and tracking practices a secret from its customers.

26.     Even were a consumer to understand the privacy policy and the so-called "option" to "opt-out" of the monitoring program, the consumer must then follow the numerous steps to deactivate the tracking software, none of which naturally appear to relate

8

to disabling tracking software. Consumers would need to find a menu item called "RESET & ADMIN" on the television display. On this menu appear several items, one of which is entitled "Smart Interactivity." Once highlighted, the description of this menu item is "Enables program offers and suggestions." It does not state that "Smart Interactivity" monitors, tracks, and reports viewing habits and information about devices attached to home networks.

### Facts Related to Plaintiff

27.    On February 1, 2013, Plaintiff Stanley Pagorek purchased a Vizio Smart TV from a Costco near his home in Merrillville, Indiana.  Plaintiff paid approximately six hundred and ninety dollars ($690.00) for the Vizio Smart TV.

28.    Plaintiff connected his Vizio Smart TV to the internet via his home wireless network.  Plaintiff has, since purchasing the Vizio Smart TV, watched shows, movies and other entertainment programs, often through the pre-loaded applications on the Smart TV.

29.    Plaintiff did not consent at the time of purchase and set-up, nor has he consented at any time since, to the operation of the Defendants' tracking software on his Smart TVs.  Additionally, Vizio did not notify Plaintiff of the pre-installed tracking software, either in printed materials contained in the Smart TV packaging or in the prompts guiding plaintiff through the setup of the Smart TV.

30.    Had Plaintiff known that the Defendants installed Tracking Software on his television sets and were actively monitoring his viewing habits, he would not have purchased the Vizio Smart TV.

### Class Allegations

31. **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and Rule 23(b)(3) on behalf of himself and all other similarly situated individuals in the United States who purchased one or more Vizio Smart TVs with the Defendant's tracking software installed.

32. **Numerosity:** The exact number of members of the Class is presently unknown and is not available to Plaintiff. However, given information publicly disseminated by Defendant Vizio, the Class likely includes hundreds of thousands of individuals, making individual joinder impossible.

33. **Commonality and predominance:** Many common questions of law and fact permeate Plaintiff's claims and the claims of other Class members. These questions predominate over any questions that may affect individual Class members. These common questions include, but are not limited to, the following:

    a.    Whether Defendants installed tracking software as described above on the Vizio Smart TVs;

    b.    Whether Defendants attempted to conceal from its customers the existence of this tracking software on the Vizio Smart TVs;

    c.    Whether Defendants actually notified customers that the tracking software was installed on the Vizio Smart TVs;

    d.    Whether Defendants did indeed, and continue to, monitor and track its customers' viewing habits;

e.     Whether Defendant Vizio unlawfully disclosed and continues to unlawfully disclose consumers' personally identifiable information, including their viewing records, in violation of 18 U.S.C. § 2710(b);

f.     Whether Defendant Vizio's disclosures were committed knowingly;

g.     Whether Defendants' conduct as described herein as willful;

h.     Whether Defendants' conduct described herein constitutes fraudulent omission;

i.     Whether Defendants' conduct described herein constitutes negligent omission;

j.     Whether Defendants' conduct described herein has caused them to be unjustly enriched.

34.    **Typicality:**  Plaintiff's claims are typical of the claims of the other members of the Class and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Class.

35.    **Adequate Representation:**  Plaintiff will fairly and adequately protect the interests of the Class because he has no conflicts of interest with any Class members and has retained counsel who are experienced in consumer protection law and class action litigation.

36.    **Superiority:**  A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.  Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis.  No

unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this forum is convenient to the parties.

37.     **Policies Generally Applicable to the Class:**  This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole.  Defendants' policies challenged herein apply and affect the members of the Class uniformly and Plaintiff's challenge of these policies hinges on defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

**COUNT ONE**
**Violations of the Video Privacy Protection Act**
**18 U.S.C. § 2710**

38.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

39.     Defendant Vizio is a "video tape service provider" as defined by the Video Privacy Protection Act (hereinafter "VPPA").  Vizio "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale or deliver of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  Specifically, Vizio delivers videos and "similar audio visual materials" to consumers through its internet-connected Smart TVs, as well as through many of the pre-loaded applications available on its Smart TVs.

40.     Plaintiff Stanley Pagorek is considered a "consumer" under the VPPA because he is a "renter, purchaser or subscriber of goods or services from a video tape

service provider[.]" 18 U.S.C. § 2710(a)(1).  As described above, Plaintiff purchased a Smart TV manufactured, marketed and distributed by Vizio.

41.   Plaintiff Stanley Pagorek and his family, including his grandchildren, have watched many movies and television shows on the Vizio Smart TVs.  Upon information and belief, at all times Vizio secretly monitored Plaintiff's usage of his Smart TVs and collected information on Plaintiff's viewing habits, performed scans of Plaintiff's home WiFi network and transmitted this information to Defendant Vizio.

42.   Unbeknownst to Plaintiff, Defendant Vizio has disclosed and continues to disclose Plaintiff's information, including his personally identifying information, to unidentified, unauthorized third parties.  Upon information and belief, these third parties include advertisers.

43.   Defendant Vizio's transmissions of Plaintiff's personally identifiable information to these third party brokers and advertisers constitutes "knowing[] disclosures" of Plaintiff's "personally identifiable information" to a person under the VPAA.  18 U.S.C. § 2710(a)(1).

44.   Plaintiff did not, at any time, consent to Defendant Vizio's collection and disclosure of his personally identifiable information to these third party data brokers and advertisers.

45.   Defendant Vizio's unlawful disclosures constitute a direct violation of the VPAA.  Thus, Plaintiff's statutory rights under the VPAA have been violated and he is therefore entitled to the maximum statutory and punitive damages available under the VPAA, 18 U.S.C. § 2710(c).

13

**COUNT TWO**
**Violation of the Prohibition of Disclosure by Persons Providing Video Recording**
**Sales or Rentals Without Written Consent**
**Cal. Civ. Code § 1799.3**

46.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

47.     In violation of California Civil Code, section 1799.3(a), Defendants, who provided video recording sales or rental services to Smart TV owners who connected their televisions to the internet, disclosed such consumers' personal information or the contents of any record, including sales or rental information, which was prepared or maintained by Defendants, to third parties without the written consent of the Smart TV user, as fully described above.

48.     Defendants willfully violated section 1799.3(a), as freely admitted in statements to the Securities and Exchange Commission, the media, and in its prospectus.

49.     Plaintiff and Class members may recover in this civil action, a civil penalty not to exceed five hundred dollars for each violation.

**COUNT THREE**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Civ. Code § 17200, *et seq.***

50.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

51.     The California Unfair Competition Law ("UCL") (California Business & Professions Code §17200, *et seq.,*) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

52.     The UCL prohibits any unlawful, unfair, or fraudulent business acts or practices including, the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact.

## Unlawful or Unfair Business Act or Practice

53.     As described herein, Defendants' continued utilization of unlawful and unconscionable marketing practices, and their continuing practice of monitoring, tracking, and reporting viewing habits and personally identifiable information to unauthorized third parties, without consent, constitutes a deceptive act or practice in violation of the UCL.

54.     The disclosure of personal viewing history and personally identifiable information is a material term of the transactions at issue as it is likely to affect a consumer's choice of, or conduct regarding, whether to purchase a product or service. The failure to inform consumers that this personal information would be shared with third parties is materially misleading.

55.     Defendants' omission of this information was an act likely to mislead Plaintiff and the Classes acting reasonably under the circumstances and constitutes a deceptive trade practice in violation of the UCL.

56.     Defendants violated the "unfair" prong of the UCL by, among other misconduct described in this Complaint, transferring Plaintiff and the Classes' personal viewing habits and personally identifiable information without providing clear and conspicuous notice and without consent.

57.     In violation of the Video Privacy Protection Act, 18 U.S.C. §§ 2710, and California Civil Code, section 1799.3(a), Defendants monitored, tracked, and transmitted

personal viewing histories and personal identifiable information to third parties without Plaintiffs' and Class members' consent. A violation of these statutes constitutes a violation of the UCL.

### Fraudulent Business Act or Practice

58.     Defendants also made material omissions when speaking to Plaintiff and Class members through written materials. As described fully above, Defendants failed to clearly and conspicuously inform consumers that once their Smart TVs were hooked up to the internet through an IPP address, Defendants would monitor, track, and transmit personal viewing histories and personally identifiable information to third parties without Plaintiff's and Class members' consent.

59.     Plaintiff satisfies the requisite level of specificity for pleading a violation of section 17200's protection against fraudulent business acts as alleged above.  Particulars of the fraudulent omissions are summarized here:

> a.     Defendants failed to clearly and conspicuously inform Plaintiff that once his Smart TVs was hooked up to the internet through an IPP address, Defendants would monitor, track, and transmit his and his family's personal viewing histories and personally identifiable information to third parties without Plaintiff's consent.

> b.     The material omissions occurred on or around February 1, 2013, as to the named Plaintiff.

> c.     The relationship that gave rise to the duty to speak was by knowing that the Smart TV would, once connected to the internet, obtain

16

confidential information, including viewing histories and personal identifiable information, and transmit that information to others without the knowledge or consent of the viewer. All Defendants had superior knowledge as to the information withheld, and such information was material.

d.   By engaging in the deceptive conduct, all Defendants obtained substantial financial benefits by selling information about the Plaintiff, including personally identifiable information, to unauthorized third parties.

60.   The injuries caused by the Defendants' conduct are not outweighed by any countervailing benefits to consumers or competition, and neither Plaintiff nor the Class could have reasonably avoided the injuries they sustained.

61.   Defendants intended that Plaintiff and the Classes would rely upon Defendants' deceptive conduct and not be aware of or understand the necessity to disable the Tracking Software.

62.   The acts complained of herein, and each of them, constitute unfair, unlawful or fraudulent business acts or practices in violation of Business and Professions Code §17200 *et. seq*.  Such acts and practices have not abated and will continue to occur unless enjoined.

63.   The unfair, unlawful or fraudulent business acts or practices set forth above have and continue to injure Plaintiff, the Classes, and the general public and cause the loss of money. These violations have unjustly enriched Defendants at the expense of Plaintiff

and the Classes. As a result, Plaintiff, the Classes and the general public are entitled to restitution, injunctive relief, and other equitable relief.

64.     The unfair, unlawful, or fraudulent business acts or practices at issue in this Complaint and carried out by all Defendants took place in the course of trade or commerce. Plaintiff and the Classes lost money or property (or lost uses of their money and interest), as a proximate result of Defendants' conduct.

65.     By this action, Plaintiff and the Classes request that Defendants be ordered to make restitution of any money, property, goods or services that may have been acquired through their violation of Business & Professions Code § 17200 as alleged in this Complaint.

66.     Pursuant to Code of Civil Procedure § 1021.5 of the Code of Civil Procedure and the Court's inherent equitable power, Plaintiff and the Classes seek recovery of their costs of suit and reasonable attorneys' fees.

**COUNT FOUR**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750, et seq.**

67.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

68.     The Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750 *et seq*, applies to Defendants' actions and conduct because such actions and conduct pertain to transactions that were intended to result and/or resulted in the sale of goods and services to consumers.

18

69.     Plaintiff and each member of the Classes are "consumers" within the meaning of Civil Code § 1761(d).

70.     Televisions are "goods" within the meaning of Civil Code § 1761(a) and (b).

71.     Defendants engaged in deceptive practices, unlawful methods of competition and unfair acts as defined by Civil Code §1770, to the detriment of Plaintiff and the Class. Plaintiff and all other members of the Class have suffered harm and damages as a proximate result of the violations of law and wrongful conduct of Defendants alleged herein.

72.     Defendants intentionally and unlawfully perpetrated harm upon Plaintiff and the Class by the above-described acts, and as follows:

a.     In violation of Civil Code §1770(a)(5), Defendants represented that its Smart TVs had characteristics, ingredients, uses, benefits, or quantities which they do not have;

b.     In violation of Civil Code §1770(a)(7), Defendants represented that its Smart TVs were of a particular standard, quality, or grade, when they were of another;

c.     In violation of Civil Code §1770(a)(9), Defendants advertised its Smart TV with intent not to sell them as advertised; and

d.     In violation of Civil Code §1770(a)(19), Defendants inserted an unconscionable provision in a contract.

73.     Defendants concealed material information about their Tracking Software as described above from Plaintiff and the Class. Had Defendants disclosed this material information, Plaintiff would not have purchased the Smart TV from Defendants.

19

74. Defendants' unfair or deceptive acts or practices were capable of deceiving a substantial portion of the purchasing public.

75. Defendants' acts and omissions and unfair business practices occurred in the course of selling consumer products and violate Civil Code § 1770(a).

76. Defendants had a duty to disclose, clearly and prominently, that its TVs had Tracking Software installed and activated. Defendants had superior knowledge of the presence of the tracking technology, which goes beyond what is normally expected to be part of a television purchase and usage. Plaintiff and consumers could not reasonably have been expected to learn that Defendants included the Tracking Software on its TVs. Defendants knew that Plaintiff and consumers would not likely purchase the TVs if they knew about the Tracking Software.

77. The default enabling of the Tracking Software was a fact material to Plaintiff's and consumers' transactions, and should have been disclosed. A reasonable consumer would have considered that fact to be important in deciding whether or not to purchase the TV.

78. Pursuant to the provisions of California Civil Code section 1782, on December 14, 2015, Plaintiff, by and through his attorney of record, provided written notice to each Defendant, by certified mail, return receipt requested, specifying the particular violations, and demanding that Defendants rectify the illegal acts within 30 days. Specifically, Plaintiff demanded that Defendants each immediately completely disgorge and pay monetary damages equal to the total amount of monies paid to Defendants by Plaintiff and other consumers similarly situated in the United States, together with interest

thereon calculated at the highest applicable legal rate. The Demand was received and signed for by Vizio on Cognitive on December 21, 2015.

79.     As a direct result of Defendants' violation of the CLRA, Plaintiff and Class members have suffered harm by paying money to purchase their Smart TVs, by paying more money to purchase their Smart TVs than they otherwise would have, by receiving no reasonable compensation for the value of their private data sold to third parties, or a combination of such harms.

**COUNT FIVE**
**Indiana Deceptive Consumer Sales Act**
**Ind. Code §§ 24-5-0.5, *et seq*.**

80.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

81.     Defendant Vizio's actions as described above constitute a violation of the Indiana Deceptive Consumer Sales Act (hereinafter "DCSA").  Defendant is considered a "supplier" as it is defined in the DCSA, and Plaintiff's purchase of the Vizio Smart TVs constituted a "consumer transaction" under the DCSA.  Ind. Code § 24-5-0.5-2.

82.     As detailed above, the Defendants have engaged in incurable deceptive practices as defined under the DCSA.  The Defendants' actions were part of a scheme intended to actively mislead Plaintiff and other Vizio Smart TV consumers into believing that the Smart TVs were of a specific quality, namely that the Smart TVs would not violate their privacy and were not designed to violate consumer's privacy by secretly monitoring and recording consumers' viewing habits, while Defendants did in fact know that the Smart TVs were designed to accomplish precisely this objective.

21

83.     Additionally, Defendants did not disclose that their tracking software was installed on the Smart TVs because they knew that consumers, such as the Plaintiff, would not likely purchase the Smart TVs if they knew of the tracking software.

84.     The Defendants' deceptive acts and practices were capable of deceiving a substantial portion of the purchasing public.  In fact, the Defendants knew and intended that Plaintiff and other reasonable consumers could not be expected to learn about or discover the existence of the tracking software on the Vizio Smart TVs.

85.     Through these deliberate omissions, the Defendants deceived the Plaintiff about the quality of the Vizio Smart TVs and, as such, wrongfully induced the Plaintiff to purchase the Smart TVs.

86.     As a direct and proximate result of Defendants' violations of the DCSA, Plaintiff has suffered harm in the form of paying monies to purchase the Smart TV when he would otherwise have not purchased it.

87.     Plaintiff requests all appropriate remedies against Defendants for its willful violations of the DCSA, including monetary damages and an injunction requiring the Defendants to immediately cease the wrongful conduct alleged herein.

## COUNT SIX
## Unjust Enrichment

88.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

89.     A measurable benefit has been conferred on Defendants under such circumstances that Defendants' retention of the benefit without payment to Plaintiff and Class members would be unjust.

90.     The benefit is the taking of Plaintiff's and Class members' private information and capitalizing on it by selling it to third parties for Defendants' monetary gain.

91.     The benefit is measurable because Defendants' systematically, through carefully designed computer programs and calculations, commoditized and packaged Plaintiff's and Class members' private information and sold it to third parties.

92.     Defendant retained both the private information and profits from its sale.

93.     Defendants' retention of the benefits would be unjust because this information was private and personal, it contained personally identifiable information, and Plaintiff and Class members would not have voluntarily provided that information for free, as Defendants have admitted, such as in its Prospectus.

**COUNT SEVEN**
**Fraud by Omission**

94.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

95.     In the context of a consumer transaction, where a seller chooses to speak about any aspect of a product or service, the deliberate failure to disclose all material facts regarding those issues constitutes fraud.

96.     A significant part of Defendants' marketing of Vizio Smart TVs was informing consumers at large that the TVs could be connected to the internet through a home network. Defendants touted the myriad, additional programming options and features such a connection would bring. Defendants' deliberately, however, chose to mask the fact that connecting to the internet in this way would allow Defendants to spy on and record personal viewing histories and personally identifiable information without their consent. Defendants recognized that its undisclosed Tracking Software and third party sales scheme was material, in that it admitted that if the public knew the truth, it would significantly impact sales of its Smart TVs and its ability to sell the personally identifiable information to third parties.

97.     Plaintiff and Class members were harmed as a result of Defendants' fraud by omission.

## COUNT EIGHT
### Breach of the Implied Warranty of Merchantability

98.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

99.     Plaintiff brings this claim for breach of the Uniform Commercial Code's implied warranty of merchantability on behalf of himself and other owners of affected Smart TVs.

100.    Defendants are merchants as defined by applicable UCC provisions.

101.    Though privity is not required, Plaintiff and Class members were in privity with Defendants in that they purchased their TVs from retail agents of the Defendants,

including the Defendants' authorized dealers. Defendants intended Plaintiff and Class members, not the retail sellers they use to sell Smart TVs, to be the end users for whom the requirements of merchantability apply.

102.    Further, though privity is not required, Plaintiff and Class members were and are also in privity with Defendants by virtue of the contractual relationship stemming from the Smart TVs' written warranties provided in conjunction with the purchase of their TVs, which are enforceable by Plaintiff and Class members against Defendants, regardless of where, or from whom, Defendants' products were acquired. Further, or in the alternative, Plaintiff and Class members were intended third-party beneficiaries of Defendants' contract for sale of Smart TVs to the persons or entities from whom Plaintiff and Class members ultimately purchased their Smart TVs.

103.    Defendants have breached the implied warranties of merchantability that they made to Plaintiff and Class members. To illustrate Defendants' breaches, using California law as an example: the Defendants impliedly warranted to Plaintiff and Class members that their Smart TVs were free of defects, that they were merchantable, and that they were fit for the ordinary purpose for which such goods are used. *See*, *e.g.*, Cal. Com. Code § 2314 (setting forth, as codified in California, the UCC's implied warranty of merchantability). The ordinary purpose of a television such as those at issue is viewing programs solely in the environment selected by the television owner. In addition, an ordinary use of devices, such as Smart TVs, that connect to the internet is the use of applications. Defendants impliedly represented to Plaintiff and Class members that the

Smart TVs at issue were free of defects that could impinge on these ordinary uses, that they were merchantable with respect to such uses, and that they were fit for all such purposes.

104.   As alleged herein, however, Defendants' sales of Smart TVs breached the implied warranty of merchantability because the devices were defective, unmerchantable, and not fit for the ordinary purpose for which such goods are used. More specifically, all Smart TVs that contained Tracking Software are defective and unfit for their ordinary purposes because, rather than performing as impliedly represented, these devices instead intercept, monitor, track, and transmit personal viewing histories and personally identifiable information to third parties without Plaintiff's and Class members' consent.

105.   Defendants additionally breached the implied warranty of merchantability because Smart TVs, which all used Tracking Software, were defective, unmerchantable, and unfit for the ordinary purpose for which these goods are used because they intercepted and transmitted to third parties information contained on other devices sharing the same IP address as the Smart TVs, such as home computers, tablets, and cell phones. Defendants intended and caused this data to be used by third party advertisers. Thus, Defendants' Smart TVs are defective because they cause private data contained on a person's other personal devices (cell phones, tablets, and personal computers) to be monitored and transmitted to third parties.

106.   The Defendants have had reasonable and adequate notice of Plaintiff's and Class members'—i.e., consumers', rather than commercial parties'—claims for breach of implied warranty of merchantability, including by way of the individual suits that preceded filing of either consolidated amended complaint, by way of numerous reports of these

breaches likely made to them directly, by way of media interviews and other publications which preceded the filing of plaintiffs' suits, and by way of their own statements reflecting exacting knowledge and actual intend to have their Smart TVs function in the manner alleged to be defective. Yet then and to-date, Defendants have demonstrated no willingness to make Plaintiff and Class members whole. Furthermore, to the extent notice might be required under any reading of applicable law, any such notice would not be required to go to the Defendants, but rather, only to the direct sellers of Plaintiff's and Class members' Smart TVs, and the direct sellers are not defendants in this action.

107.   Any purported modifications or limitations of the implied warranty of merchantability, including by way of terms set forth in Defendants' written warranties, are invalid, void, and unenforceable per the MMWA. 15 U.S.C. § 2308(a)(1).

108.   As a result of Defendants' breaches of their implied warranties of merchantability, plaintiffs and other owners of affected TVs have been injured and are entitled to the full panoply of remedies provided under Article 2 of the UCC as adopted by the various states, as well as all other applicable remedies. These include, including under California law specifically, monetary damages. *See, e.g.*, Cal. Com. Code § 2714. Because of the defects in the Smart TVs and their behavior as described herein, there was no value to the goods as accepted. The value of these devices had they been as warranted may be measured by their purchase prices; accordingly, damages in the sums of their purchase prices, or as otherwise measured pursuant to the damages provisions of Article 2 of the UCC, are warranted to Plaintiff and Class members. *See*, *e.g.*, Cal. Com. Code § 2714(2).

109.    On December 14, 2015, Plaintiff, by and through his attorney of record, provided written notice to each Defendant, by certified mail, return receipt requested, specifying the that Vizio Smart TVs were defective at the time of delivery, which he alleges here, in breach of the implied warranty of merchantability, in that they monitor, track, and transmit personal viewing histories and personally identifiable information to third parties without Plaintiff's and Class members' consent. Specifically, Plaintiff demanded that Defendants each immediately completely disgorge and pay monetary damages equal to the total amount of monies paid to Defendants by Plaintiff and other consumers similarly situated in the United States, together with interest thereon calculated at the highest applicable legal rate. The Demand was received and signed for by Vizio and Cognitive on December 21, 2015.

110.    As a direct and proximate result of defendants' breaches of the warranties of merchantability, Plaintiff and Class members have been damaged in an amount to be proven at trial.

## COUNT NINE
## Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511

111.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

112.    Defendants, either directly or by aiding, abetting or conspiring to do so, have intentionally intercepted or procured to be intercepted Plaintiff's and Class members' electronic communications without Plaintiff's or Class members' knowledge, authorization, or consent in violation of 18 U.S.C. § 2511.

28

113.    Defendants, either directly or by aiding, abetting or conspiring to do so, have also intentionally used or procured to be used a device to intercept the above-referenced electronic communications.

114.    Defendants, one or all of them, conspired to intercept the content of the programs viewed by Plaintiff and Class members on their Smart TVs, as alleged herein.

115.    Through the loading and enabling of ACR software on Smart TVs, and Cognitive's provision of the software, collection of communications,  and provision of services to permit the illegal interception of electronic communications as alleged herein, Vizio and Cognitive, one or all of them, set out on a course of conduct with the intention of intercepting communications of Plaintiff.

116.    An "electronic communication" is defined in § 2510(12) as any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce. This definition includes television programming.

117.    Defendants violated 18 U.S.C. § 2511(1)(a) by intentionally intercepting, endeavoring to intercept, or procuring another person to intercept or endeavor to intercept Plaintiff's and Class members' electronic communications.

118.    Defendants violated 18 U.S.C. § 2511(1)(c) by intentionally collecting, transmitting, storing and disclosing, or endeavoring to disclose, to any other person, the contents of Plaintiff's and Class members' electronic communications, knowing or having

reason to know that the information was obtained through the interception of Plaintiffs' and class members electronic communications.

119.   Defendants violated 18 U.S.C. § 2511(1)(d) by intentionally using or endeavoring to use, the contents of Plaintiff's and class members electronic communications, knowing or having reason to know that the information was obtained through the interception of Plaintiff's electronic communications.

120.   Neither Plaintiff nor Class members authorized or consented to Defendants' interception of electronic communications.

121.   Section 2520 of the ECPA provides for a private cause of action and allows for declaratory and equitable relief as appropriate, damages, disgorgement of profits, and statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, and reasonable attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Stanley Pagorek, on behalf of himself and all others similarly situated, respectfully requests that the Court enter an order:

A. Certifying this case as a class action and appointing Mr. Pagorek as class representative and his counsel as class counsel;

B. Awarding all damages, restitution, disgorgement, injunctive relief, penalties, or any combination of such relief, as may be provided at law and in equity;

C. Awarding Plaintiff and the Class pre- and post-judgment interest, reasonable attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

PAVICH LAW GROUP, P.C.

By: */s/* ROBERT J. PAVICH
    Robert J. Pavich
    Ian H. Levin
    John J. Pavich
    PAVICH LAW GROUP, P.C.
    30 W. Monroe Street, Suite 1310
    Chicago, Illinois 60603
    Telephone: (312) 690-8400
    rpavich@pavichlawgroup.com
    ianhlevin@gmail.com
    jpavich@pavichlawgroup.com

    David M. Cialkowski (MN 306526)
    Brian C. Gudmundson (MN 336695)
    ZIMMERMAN REED, LLP
    1100 IDS Center
    80 South 8th St.
    Minneapolis, MN 55402
    Telephone: (612) 341-0400
    david.cialkowski@zimmreed.com
    brian.gudmundson@zimmreed.com

    Caleb Marker
    ZIMMERMAN REED, LLP
    555 East Ocean Blvd., Suite 500
    Long Beach, California 90802
    Telephone: (877) 500-8780
    caleb.marker@zimmreed.com

    Walid J. Tamari
    Catherine Towne
    TAMARI LAW GROUP, LLC
    55 W. Monroe Street, Suite 2370
    Chicago, Illinois 60603
    Telephone:  (312) 368-5000
    wtamari@tamarilaw.com
    ctowne@tamarilaw.com

*Attorneys for Plaintiff and the Putative Class*